## McLain *versus* Commonwealth.

1. At a coroner's inquest upon a murdered person the evidence of a witness was taken down by a bystander, the report being expressed to be "for whom it may concern." The evidence was not taken down under the direction of the coroner, nor was it certified and returned by him with the inquisition. Subsequently, on the trial of the alleged murderer, the witness was unable, through temporary illness, to appear in court. The report of his evidence before the coroner was offered in evidence on behalf of the defendant. *Held*, that it was rightly rejected.

2. On a trial for murder there was but a single witness for the Commonwealth who testified to having seen the crime committed. There was, however, much evidence tending to corroborate him. The defendant introduced considerable evidence to discredit the single witness. The court laid due stress upon all the discrediting evidence, but instructed the jury that it was not essential that the single witness should be corroborated. *Held*, that this instruction did not constitute error.

3. On a trial for murder, the fact of the murder being established, inability to discover the motive does not disprove the crime.

4. Where a murder of great atrocity was committed without discoverable motive on the part of the accused, the court in its charge, after dwelling at length upon the evidence as to the good character of the accused and impressing the jury with the weight of such evidence, said: "Where it is a question of great and atrocious criminality, the commission of the act is so unusual, so out of the ordinary course of things and beyond common experience, it is so manifest that the offence if perpetrated must have been influenced by motives not frequently operating on the human mind, that evidence of character and of a man's habitual conduct under common circumstances must be considered far inferior to what it is in the instance of an accusation of lower grade." The court then added that evidence of reputation might of itself create in the minds of the jury a reasonable doubt of the existence or truthfulness of the criminating circumstances, and thus induce them to acquit the defendant. *Held*, that this instruction as qualified did not constitute error.

5. *Semble*, that the court approve the doctrine of Shaw, C. J., in the above quotation from the charge in Prof. Webster's case.

6. On a trial for murder the testimony tended to show that the crime had been committed with a certain shovel which had stains upon it. These were subjected to chemical analysis and microscopic examination by different experts, some of whom asserted that the stains were caused by human blood, while others failed thus to identify them. Certain unlearned observers testified that in their opinion the stains were caused by human blood. The court, remarking that if scientific research gave no aid in such an investigation it was deplorable, instructed the jury that they might convict upon the testimony of the unlearned observers if they were satisfied of its truth. *Held*, that this was not error.

7. Where the court in charging the jury in a criminal case sufficiently bring the evidence on both sides to the attention of the jury and com-

[McLain v. Commonwealth.]

ment fairly upon the facts, it is not error to present some of the facts in the form of questions. Such a course is sometimes well calculated to present for consideration the exact points in controversy.

8. The charge of the court in the present case pronounced clear, full, impartial and satisfactory.

November 1st 1881. Before SHARSWOOD, C. J., MERCUR, GORDON, TRUNKEY, STERRETT and GREEN, JJ. PAXSON, J., absent.

ERROR to the Court of Oyer and Terminer of *Allegheny county:* Of October and November Term 1880, No. 64.

Indictment of Samuel McLain, Samuel Gisal and Theodore Gross, for the murder of Samuel Hunter. A nolle prosequi was entered as to Gross. McLain and Gisal pleaded not guilty, and a separate trial was allowed to McLain on his demand.

On the trial, before BAILEY, J., the following facts appeared:—On the evening of the 5th of March 1879, about half-past six o'clock, the dead body of Samuel Hunter, a lad fourteen years of age, was found lying in the edge of the Monongahela river, not far from the foundry and stable where he had been employed as a driver boy. His face was greatly mutilated, the left side of his skull was broken in, and a small piece was cut off the end of a finger.

Samuel Hunter had been seen riding his mule from the foundry to the stable at six o'clock, just as the foundry whistle blew; a little later he was seen at the trough watering his mule, and then taking the animal into the stable. So far as the testimony disclosed, he was not seen to leave the stable.

Among the men known to have been at the stable between six and half-past six o'clock on that evening was the defendant, Samuel McLain, who was a stable boss. In the absence of any clue to the murderer suspicion fell on him, also on Samuel Gisal, who was also engaged about the stable, and on a colored man named Theodore Gross, all of whom were arrested. A day or two after their imprisonment Gross was told by the police that McLain and Gisal had charged the crime on him, and that McLain and Gisal would be discharged from custody. Gross then charged the murder on McLain. He testified on the trial that on the evening in question he was standing at the watering trough when he saw Hunter take his mule into the stable, and McLain follow him in; that he then went to the stable door, looked in, and saw Hunter put his mule in the stall, and as he was backing out from the stall McLain hit him twice on the head with a coal shovel, and Hunter fell dead after the second blow; that Gisal, who was silently standing by, then got a coffee-sack which was lying on the hay-rack, into which the two men put the dead body, and McLain slung it over his

[McLain *v.* Commonwealth.]

shoulder, and with Gisal took it towards the river's edge, towards the place where it was found. The defendant showed that there were some inconsistencies between the story testified to by Gross on the trial, and that sworn to by him at the coroner's inquest.

Bernard Churchill, a witness for the Commonwealth, testified that on his way home from work about the hour in question, he saw two men carrying a burden across the field towards the river; he thought at the time it was a bag of provisions they were taking to the ferry—there being a skiff ferry at the point in the river where the body of Hunter was found. He did not, however, locate the position of the men carrying the burden in exact correspondence with that sworn to by Gross.

The Commonwealth put in evidence the shovel with which Gross testified the killing was done, and portions of the clothing worn by McLain, and offered to prove by the testimony of several witnesses, physicians and laymen, that certain stains found upon the shovel and clothing were those of human blood. One of the physicians testified that in his microscopical examinations of specimens of the substance scraped from the shovel, he found well-defined blood disks or corpuscles which resembled human blood corpuscles, and which he believed to be such. Several other physicians testified that they failed to find blood corpuscles in similar specimens. Unlearned witnesses testified to the effect that stains on the shovel looked as if they had been caused by human blood. One or more of the physicians testified that it would be impossible to determine by inspection by the naked eye the presence of human blood upon a rusty and dirty shovel several days after the stains had been made; also that while it might be possible to detect blood in old stains by chemical, microscopic or spectroscopic tests, it would be difficult, if not impossible, to discriminate between human blood and that of other mammalia.

Some time after the finding of the body a large hatchet was found in the bed of the stream near where the body was found. A large portion of the medical testimony was directed to show that the wounds on Hunter's head and hand could not have been made by the shovel, but could have been made by the hatchet.

Nicholas Kramer, who owned a skiff at the ferry, testified that about twenty minutes past six on the evening in question, while he was on the opposite bank of the river, he heard a scream or shout which appeared to proceed from the point where the dead body was afterwards found. About the same time another witness saw two men running away from the river bank. Nicholas Kramer crossed the river about fifteen minutes later, with two other men, and they then found the dead body

[McLain v. Commonwealth.]

lying in the water. The theory of the defence, founded upon the foregoing evidence and on the fact that no blood was found in the stable, was that Hunter was killed at the river side by an unknown person or persons other than the defendant, and not in the stable as contended by the Commonwealth.

Counsel for the defendant offered in evidence a report of the testimony of one James Cox, given at the coroner's inquest, Cox being ill and unable to attend court. The evidence was taken down by a shorthand writer, who attended the inquest and took down the proceedings, as he stated, "for whomsoever it may concern." He was not requested to do so by the coroner, and the coroner did not certify to the notes. At the time of the trial, Cox was within the jurisdiction of the court, but was recovering from an attack of typhoid fever, and was still confined to bed. Objected to as incompetent, and because there was no cross-examination by the Commonwealth; objection sustained; exception.

On the part of the defence, a large number of witnesses testified to the good character and reputation of McLain. A witness testified that McLain was outside of the stable, at work boarding up the over-shoot of the barn during the afternoon in question until twenty-eight minutes past six o'clock, when the witness started for a train; and that it would have been impossible for McLain to have walked from there to the river between that time and the time the body was found. It was also shown that McLain's young son was present at the stable at the time in question, and the boy himself testified he was there and accompanied his father home. McLain's whereabouts were traced and accounted for during that evening. After he left the stable, he went home, ate his supper, went to East Liberty and purchased a lot of groceries, which he brought home on the eleven o'clock train. On arrival he was informed that Samuel Hunter had been killed; he then went to his house, left his packages and joined in the search for evidences of the crime.

The Court delivered a lengthy charge, of which the following extracts include all the portions assigned for error:

"You will also consider whether the statements of Gross here have been so corroborated that you can safely trust to particulars in which he has not been corroborated. [It is not indispensable that Gross should be corroborated;] if satisfied with his testimony you have a right to convict upon it though uncorroborated, but confirmation of it may lead you to believe it, when if not corroborated you might not. . . . . [Were Gross's eyes accustomed to the obscurity of the stable so that he might have been able to see when others say they could not?] . . . .

"The Commonwealth has offered testimony tending to show

that there was human blood upon the shovel in evidence, when found in the stable, and also such blood upon the left shoulder of the overcoat worn by defendant on the 5th of March. The answer to this on the part of the defence, if I understand it, is that no one by the unaided eye can distinguish blood of any animal from madder, or from certain paints, dyes and fruit juices, and that by no chemical test or scientific appliance can human blood be distinguished from that of many animals, and that any testimony to the effect that blood, if any, found on the shovel or coat is human blood, is utterly unreliable. The claim is, that in order to know that anything discovered is truly blood there must be a scientific examination, and that such examination will utterly fail to show that the blood if such be found, may not be that of some domestic animal, [in fine, that to know the blood of man with sufficient certainty to make it of avail as evidence, it must be seen to flow from human veins.]  .  .  .

" [If scientific research only establishes that our supposed knowledge is mere ignorance, and not only gives us nothing better in its place, but merely informs us that we must be content to remain in ignorance in respect to a most important element in the discovery of a heinous crime, it is certainly most deplorable. The result here claimed is surely at variance with all that scientific investigation has taught us of the diversity and distinctiveness of the works of creation, and is not to be accepted unless it be clearly established.]

" [I undertake to say that a jury may, if satisfied of its truth, lawfully convict upon proof of the existence of human blood by the testimony of unlearned observers. I will read from the opinion of our Supreme Court in the case of William Gaines, reported in 50 State Reports : " Several of the witnesses had testified to having seen blood on the day after the murder, in various places, near the window through which the fatal shot was fired, and along the route which the murderer was supposed to have taken. As the defendant had been wounded shortly before the murder, and was bleeding profusely, the evidence, if believed, tended to show that he was near the place when the gun must have been fired ; that he had returned to the house of the deceased without any other apparent motive for his return than a desire for revenge upon the deceased, who had wounded him, and had retreated again along the route over which the blood was traced to the place where he was afterwards discovered. Indeed, it was most pregnant evidence, difficult to be reconciled with any other hypothesis than that of his guilt. Whether what the witnesses saw was really blood, was, therefore, a vital question. They testified positively that it was. They saw it the next day, and they traced it a considerable distance."

[McLain *v*. Commonwealth.]

" I read from the charge of the court below : ' But we cannot instruct you,' is what the court below said, and what is complained of in the Supreme Court, ' We cannot instruct you that because no analysis has been made of the substance which the witnesses supposed to the blood—no chemical test, no microscopic examination—that you are therefore to reject the evidence as insufficent to show that it was blood. We feel it to be our duty to refer the question to you.'

" I now read from the second paragraph, on the same page, which is the language of the Supreme Court: ' It is insisted on behalf of the defendant, that the Commonwealth was bound to prove, by chemical analysis or microscopic test, that the substance which the witnesses saw and declared to be blood, was such, and that all evidence short of such analysis was insufficient and should have been withdrawn from the jury. The position is wholly untenable.']

" The conflicting evidence upon this subject is for you. While I have not lost my faith in an educated eye-sight, you will carefully consider what has been presented.

" [You are not bound to adopt the conclusions of one set of physicians rather than those of the other; neither does their disagreement necessarily raise a reasonable doubt. You can accept those which in your considerate judgment seem the most reasonable.]

" Stress has been laid upon the claim that no adequate motive has been shown to lead the defendant to commit the crime charged upon him. You have the right to take into account the question whether or not a motive has appeared, but there is no burden upon the Commonwealth to establish an adequate motive for the alleged crime of defendant. [We cannot safely wander into such inquiries. What would be an impelling motive to one might be wholly inadequate to move another.]

" The motive may be obscure, indeed, may not be fathomed, but the crime of murder may be proven, though the causes which may have moved the accused to commit the deed may remain inscrutable. [The Supreme Court of the state has said, ' the fact of murder being established, the inability to discover the motive does not disprove the crime;'] and again, ' when all the elements of crime are present, retribution cannot be avoided, because the motive lies hidden in the breast of him who only could disclose it.'

" The defendant has produced evidence of his general reputation for peace and good conduct among those who have known him during his past life. The effect of such evidence is not confined to doubtful cases. Evidence of good character, when proven to exist, is not a mere make-weight thrown in to assist in the production of a result that would happen at all events,

[McLain *v.* Commonwealth.]

but it is positive evidence. A case may be so made out that no previous character, however good, can make it doubtful; but there may be cases in which evidence given against a person without character would amount to certainty, in which a high character would produce a reasonable doubt, or, indeed, actually outweigh evidence which might otherwise appear conclusive.

" [On the celebrated trial of Professor Webster, Chief Justice SHAW made use of this language, which I submit to your consideration : ' Where it is a question of great and atrocious criminality, the commission of the act is so unusual, so out of the ordinary course of things, and beyond common experience, it is so manifest that the offence, if perpetrated, must have been influenced by motives not frequently operating upon the human mind; that evidence of character, and of a man's habitual conduct under common circumstances, must be considered far inferior to what it is in the instance of accusations of a lower grade.']

" Such evidence is in truth ' a fact varying greatly in value according to its nature, varying still more in value according to the proofs to which it is opposed,' but it may of itself by the creation in your minds of a reasonable doubt of the existence or truthfulness of the criminating evidence, cause you to acquit the defendant.

" The weight of the evidence here and its influence in the case are for you. [You will decide whether the general reputation of defendant in his former place of residence has been shown to have been continued in later years, and whether, if that has not been shown to your satisfaction, you are authorized to assume that it has so continued in the absence of affirmative evidence.] You will of course see that the testimony upon this point receives proper consideration. . . . .

" [Is there serious assertion by others than Dr. Dean that the long wounds on the face could have been made with a hatchet, as against the positive statements of two or more physicians that they could not have been made with such a weapon ?]

" Were there blood and brain matter on the shovel? You have the fact as to the blood asserted by one observer and by two physicians, who saw the shovel when what was supposed to be brain matter on the back of the shovel was still wet. They say what they saw were not blood stains—using the word stain as Dr. Pollock used it, in its ordinary meaning—but coagula of blood, with its distinctive characteristics. Were they mistaken ? Was Dr. Shaw mistaken when he says he found what he believed to be human blood disks in the matter taken from the shovel ? Ordinarily, affirmative evidence is greatly better than negative, but it is not, if it is impossible that one who asserts a fact can know it to be true. Is such the case here ? [Does the negative

[McLain *v.* Commonwealth.]

testimony of Drs. Wood and McCann and others that they failed
to find blood disks overcome the positive assertion of Dr. Shaw
that he did find them ?]

" [The interrogative form in which I have made my sugges-
tions is that customary in charges by the courts, and is designed
to prevent any possible misconception.    They indicate, merely,
lines of thought, to which, in the judgment of the court, your
inquiries should be directed, and are not intended to be ex-
haustive.    Your good sense will have, doubtless, suggested these
and others.    Except as such suggestions they possess no other
significance.]   .   .   .   .   .

" [An acquittal or conviction upon perjured testimony in-
volves no responsibility on the part of jurors if they do not know,
nor have reason to believe it to be false.]"

The defendant presented (in addition to a number of points
which were answered generally in the foregoing portions of the
charge), the following :—

7. The jury have the right to take into consideration the
absence of all evidence of motive for the commission of the
very high crime charged against the defendant ; also the absence
of all evidence of ill-will or previous quarrel.    Answer.    It is
for you, to say whether there is or not an " absence of all evi-
dence of motive," or " of ill-will or previous quarrel."    If you
so find, you have the right, as I have already instructed you, to
take it into consideration.

Verdict, guilty of murder in the second degree.    A motion
for a new trial was, after argument, refused by the court,
BAILEY, J., delivering an opinion, in which STOWE, P. J., and
COLLIER, J., concurred.

The prisoner was afterwards sentenced to pay the costs of
prosecution and to undergo an imprisonment in the Penitentiary
for the Western District of Pennsylvania for the term of ten years.

The prisoner, thereupon, took this writ of error, assigning
for error, inter alia : (*a*) The refusal to admit in evidence the
testimony given by James Cox before the coroner's inquest,
as taken down by a short-hand writer, the witness being too ill
to attend court.    (*b*) The portion of the charge above given
included in brackets.    (*c*) Error in the charge generally, " in
directing the mind of the jury to the criminating evidence of
the Commonwealth and omitting all reference to the material
facts of the defence ; in not presenting the defendant's case to
the jury in that clear and impartial manner, in which he was
entitled to have it considered ; in not giving proper weight to
the defence ; and in not adequately presenting it to the jury."
(*d*) In argumentatively putting interrogatories to the jury all
tending to answer or dissipate the defence set up by the pris-

oner. (*e*) In not giving specific answers to all the points submitted by defendant's counsel, and the answer to the seventh point.

The case was twice argued in the Supreme Court.

*Thomas M. Marshall* (with him *H. H. McCormick, W. D. Moore,* and *William Scott*), for the plaintiff in error.—The stenographic record of Cox's testimony at the coroner's request should have been admitted. Cox was there examined as a witness for the Commonwealth in the presence of the accused. At the time of the trial, the witness was ill and unable to attend. Under several British statutes, believed to be in force in Pennsylvania, as well as at common law, the coroner, as a high judicial officer, takes the evidence at his official inquest with fairness, "whether against or in favor of the party charged:" Stat. 3 Henry VII. cap. 1; 4 Edw. I. cap. 2; 1 & 2 Phil. and Mary; 2 & 3 Phil. and Mary; Robert's Dig. p. 106. The question has been virtually decided in this state in Brown *v.* Commonwealth, 23 P. F. Smith 321, upon which we rely. The facts there are similar to this case, except that the examination was before a magistrate, and the witness was dead at the time of the trial; but these differences are shown by the opinion of READ, C. J., in that case to be immaterial. The reason of the rule is the same in case of sickness as of death; the former is as much the act of God as the latter. When the reason exists, the rule exists. The English authorities support the proposition that the testimony of witnesses taken before the coroner on inquests, may be read in evidence on a subsequent trial in court, where by the act of God the witness is unable to be present, whether by reason of death, sickness or inability to travel; and the rule is the same in civil and criminal cases: Powell on Evidence, *254; Rex *v.* Morly, 1 Levinz 180; 2 Keble 18, 19; Kelyng's Rep. 55; 2 Hale 284; 2 Hawkins P. C. 605. The rule is the same in Pennsylvania, and in the United States: Brown *v.* Commonwealth, *supra*; Emig *v.* Diehl, 26 P. F. Smith 359. We proved the accuracy of the written testimony by the short-hand writer, who took it down. The fact that he was not specially employed by the coroner is, in the absence of circumstances tending to impeach its accuracy, immaterial.

The court erred in admitting the testimony of the existence of stains of human blood on the shovel and on the coat of the accused. The testimony of all the experts except one was concurrent that under the circumstances human blood could not be distinguished from blood of other mammalia by any scientific test, much less by the naked eye. This is sustained by all the medical and scientific text-books: Taylor's Med. Juris. 307;

[McLain *v.* Commonwealth.]

Beale, The Microscope in Medicine (Ed. 1878) 286, 267; 10 Cent. Law Jour. 184, 185; Whart. & Stille Med. Juris. (3d Ed.) 755; Woodman & Tidy, Forensic Medicine and Toxicology (Ed. 1877) 516, 517; Amer. Monthly Microscopic Journal, April 1880; Dalton's Physiology (6th Ed.) 253. The court also erred in its comments in the charge on the scientific testimony, and in charging: "I undertake to say that a jury may, if satisfied of its truth, lawfully convict upon the proof of the existence of human blood by the testimony of unlearned observers." This is a dangerous doctrine, where human life is at stake.

The court further erred in that portion of its charge relating to motive; in argumentatively putting interrogatories to the jury; in depreciating and subordinating the circumstantial evidence in favor of the defendant's theory that the killing took place at the river, and not at the stable: viz., the absence of all trace of blood at the stall or stable, where Gross swore the killing took place; the finding of the hatchet, and also the cap and dinner bucket of the murdered boy at the river, in failing to notice the testimony of the surgeons that the wounds were such as could hardly have been made with a shovel, but could well have been made with a hatchet; and generally in failing to present the defendant's case in a fair and impartial manner, while that of the Commonwealth was presented forcibly, the court even suggesting reconciliation of contradictions apparently irreconcilable with the truthfulness of Gross's story. We ask the especial attention of this court to this case in view of the subsequent acquittal of Samuel Gisal on the same indictment, and on precisely the same evidence on behalf of the Commonwealth, except that the defence had the advantage of the presence and testimony of James Cox, the exclusion of whose testimony in our case is insisted on as grave error.

*M. Swartzwelder* (*John S. Robb*, District Attorney, with him), for the Commonwealth, defendant in error.—The testimony of Cox at the coroner's inquest was properly rejected. It was not taken by or for the coroner, nor adopted nor certified by him. It was taken by a volunteer, as he stated, "for whom it may concern." At the inquest there was no accused—there was no accuser. The witnesses did not appear for either side, but in the interests of public justice. Hence, there was no opportunity for cross-examination, which is a test of the subsequent admissibility of depositions. An inquest is a common law proceeding by virtue of power vested in the coroner long before any statute. The British statutes referred to were passed not with reference to testimony taken at a coroner's inquest being read at a subsequent *trial* of the prisoner, but they related

[McLain *v.* Commonwealth.]

to its being used for the "bailment of the prisoner." It is said that these statutes are substantially in force in Pennsylvania, but this cannot be so, as the parts of the statutes relating to bailment of the prisoner have been supplied by our own statutes, and other portions of the British statutes relate to matters which do not exist here, *e. g.*, inquests in cases of rape, deodands, etc. The British statutes, if ever in force here, are now obsolete by non-user. The authorities relied on, both English and American, do not sustain the contention. In every case, the witness whose testimony given at the coroner's inquest was admitted on a subsequent trial was *dead*. Although the resolution of the Judges, on the trial of Lord Morly, as reported in Kelynge, 53–55, was, that the testimony taken before the coroner of witnesses who were "dead or unable to travel" could be read on the trial, yet it appears by the reports of the trial of Bromwich, as aiding and abetting Lord Morly, Levinz 180, and 2 Keble 19, that the witnesses referred to were dead. So, also, the witness was dead in Brown *v.* Commonwealth, 23 P. F. Smith, 325; and United States *v.* Macomb, 5 McLean 286. Emig *v.* Diehl, 26 P. F. Smith 359, was an ejectment, and clearly not in point. Such testimony of an absent sick witness has been refused even in a civil case: Harrison *v.* Blades, 3 Campbell 457. The extreme limit reached by any of the authorities is thus stated in Queen *v.* Scaife, 1 Moody & Rob. 551: "If a witness is dead or insane, or where there is no probability of his ever being able to attend, or where he is kept away by the prisoner, his deposition, if properly taken, is admissible, but other absences are insufficient ground to admit the evidence." See also, 1 Whart. on Evidence, § 179; Rex *v.* Savage, 5 Car. & P. 143; People *v.* Restell, 3 Hill 290; Regina *v.* Austin, 1 Dearsley Crown Cas. 612. If the rule, as contended for, governed in criminal cases, it would be a temptation to perjury before the coroner, there being no cross-examination, and to feigned sickness during the trial.

It is charged that the court erred in admitting the evidence relating to blood stains, and in charging that such stains might be proved by other than chemical, microscopic or spectroscopic tests. This ruling follows the decision in Gaines *v.* Commonwealth, 14 Wr. 319; and if this were not so, what becomes of all the convictions, on this ground, before these modern scopes were invented?

Mr. Justice MERCUR delivered the opinion of the court, January 3d 1882.

All the specifications of error argued, were properly presented under a few heads, and will now be so considered. The first is to the rejection of the testimony given by James Cox

before the coroner on the inquest. Cox was shown to be ill, and although convalescent at the time of the trial, yet unable to attend court.

It is undoubted law that the testimony of a deceased witness given on a former trial between the same parties in the same issue, and duly proved, is admissible in a civil case. The authorities are not in entire harmony as to the application of the same rule in criminal cases. The preponderance of authority is that the rule does so apply, if the witness be dead: 1 American Crim. Law, § 667; 1 Whart. Law of Ev. § 177; Commonwealth v. Richards, 18 Pick. 434; Crary v. Sprague, 12 Wend. 41; Brown v. Commonwealth, 23 P. F. Smith 321.

The witness Cox was not dead, nor was his sickness of a character imposing permanent disability. On the contrary, he was recovering from typhoid fever, so there was reason to suppose he would be able to attend on some future day to which the trial may have been postponed. In civil cases, the recognized rule in this state, is to admit the testimony of a witness, unable to attend court, without regard to the permanency of his sickness; yet we are not aware that the precise point has ever been decided by this court, in a criminal case. Under the rule declared in Harrison v. Blades, 3 Camp. 458; Jones v. Brewer, 4 Taun. 47, and Whart. Law of Evi. § 179, the evidence of a witness temporarily ill would be excluded in a criminal case. It however is not necessary to invoke that distinction in the present case. The action of the court rests on firmer ground. The hearing before the coroner was not between the parties to the issue in which the evidence was offered. No issue was there formed between the Commonwealth and the plaintiff in error. An inquiry there takes a broad range. It is not to ascertain the guilt of any particular person, but of every person that the evidence might implicate. No technical rules restrict or control the admission of evidence. No cross-examination of witnesses is had. The coroner's discretion marks the line where the evidence of a witness shall begin, and where it shall end.

It was contended that the evidence should have been received under the British statutes, more especially under the 1 & 2 Phil. & Mary, and the construction given thereto. Chapter 13, § 5, of that statute, does require the coroner in inquisitions finding murder or manslaughter, to put in writing the effect of the material evidence given to the jury before him, and to certify and return the same with the inquisition, thus making it a part of his judicial action. When so taken, certified and returned, and the witness be dead, the courts in England have held the evidence admissible. Our attention has not been called to any Pennsylvania authority giving such con

3 OUTTERBRIDGE—7

struction to the statute. If, however, it were otherwise, the rule could not apply to this case, as the witness is still living. Other reasons exist for its exclusion. The testimony offered was not taken down by the coroner nor under his direction or supervision. Nor was it certified or returned by him with the inquisition. It was taken by a short-hand writer at the instance of some person not clearly disclosed by the evidence, and, as testified by the writer, for "whomever it might concern." It is further urged that the evidence should have been admitted under the ruling on the trial of Lord Morely, reported in Kelynge 53, 18 Chas. II. It was then resolved, ' that in case any of the witnesses which were examined before the coroner were dead or unable to travel, and oath made thereof, that then the examination of such witnesses might be read, the coroner first making oath that such examinations are the same which he took upon oath without any addition or alteration whatsoever." This was the case in which Lord Morely and Bromwich were indicted for the murder of Hastings. The former was tried by his peers before the Lord High Steward; the latter before the Court of King's Bench; Levinz's Reports, part 1, page 180, and again reported in 2 Keble, 19. In each case it is shown that the witnesses were dead when their testimony was offered. The admission of the evidence did not rest on any temporary disability, but on their death, and the sworn testimony of the coroner as to the correct taking of the evidence offered. As the testimony of Cox was in no manner proved by the coroner the present case does not come within those authorities under the broadest rule there indicated. Nor does the case of Brown *v.* Commonwealth make the evidence admissible. There the testimony of the witness was taken before a justice of the peace on a hearing wherein Brown was charged with the crime. He was present and represented by counsel. Full opportunity was thus given for cross-examination of the witness. The accused had "met him face to face," and the witness was dead when his evidence was offered on the trial. The evidence given by Cox was properly rejected.

Gross was the only witness who testified to having seen the accused commit the murder, although there was much other evidence tending to corroborate him. If Gross was believed, the guilt of the accused was established. It was therefore of vital importance to the accused to cast discredit on the testimony of this witness. Evidence was given which, if believed, was very proper for the jury to consider in determining the credit to be given to Gross. It consisted, in part, in showing that this testimony was contrary to his previous statements; that the number of cuts found on the head of the murdered boy proved the infliction of more blows than Gross swore were struck; that

other evidence indicated he could not have been killed in the stable at the time and in the manner testified to by Gross. All the substantial contradictions to the evidence of Gross were fully, distinctly and fairly called to the attention of the jury, and they were well instructed in regard to believing that only which carried conviction to their minds.

It was further urged that no adequate motive was shown to induce the accused to commit the crime charged. The court well said the Commonwealth was not bound to establish an adequate motive for the alleged crime, and declared, in the words of this court, "the fact of murder being established the inability to discover the motive does not disprove the crime."

The fact that Hunter was murdered was unquestionably proved. The only contention was whether the accused committed the act. He gave evidence of a previous good reputation. The instructions of the court gave due weight to this evidence. It said, "evidence of good character, when proven to exist, is not a mere make-weight thrown in to assist in the production of a result that would happen at all events, but it is positive evidence. A case may be so made out that no previous character, however good, can make it doubtful; but there may be cases in which evidence given against a person without character would amount to certainty, in which a high character would produce a reasonable doubt, or indeed, actually outweigh evidence which might otherwise appear conclusive." The learned judge then submitted for "their consideration" the language of Chief Justice Shaw in the case of Professor Webster: "Where it is a question of great and atrocious criminality, the commission of the act is so unusual, so out of the ordinary course of things, and beyond common experience, it is so manifest that the offense, if perpetrated, must have been influenced by motives not frequently operating on the human mind; that evidence of character, and of a man's habitual conduct under common circumstances, must be considered far inferior to what it is in the instance of accusations of a lower grade." After reading this, he added that such evidence "may of itself, by the creation in your minds of a reasonable doubt of the existence or truthfulness of the criminating evidence, cause you to acquit the defendant." We are not prepared to dissent from the doctrine declared by Chief Justice Shaw; but qualified as it was by the court below the accused has no just cause of complaint.

Error is alleged in regard to the manner in which the court submitted the evidence proving the finding of human blood. Gross testified that the murder was committed with a shovel. Stains or discolored spots were found on the shovel and also on the clothing of the accused. These were subjected to chemical analysis and microscopic examination by different experts.

[McLain *v.* Commonwealth.]

Some succeeded in finding well-defined blood corpuscles, indicating human blood, others failed to find them. It was contended on the part of the accused that human blood could not be distinguished from that of many animals by any chemical test or scientific appliance. In answer to this, the court substantially said, if scientific research gave no such aid in the discovery of a heinous crime, it was deplorable. Nevertheless he charged that if the jury was satisfied of its truth, they might lawfully convict, upon proof of the existence of human blood, by the testimony of unlearned observers. The correctness of this view is fully sustained by Gaines *v.* Commonwealth, 14 Wright 319. That was a case of homicide, and the court below said to the jury, " We cannot instruct you that because no analysis had been made of the substance which the witnesses supposed to be blood, no chemical test, no microscopic examination, that you are therefore to reject the evidence as insufficient to show that it was blood. We feel it to be our duty to refer the question to you, and leave it for you to say whether the Commonwealth has satisfied you beyond a reasonable doubt that the spots seen by the witnesses were blood." The correctness of that ruling was affirmed by this court.

The evidence on each side was sufficiently brought to the attention of the jury, and the facts fairly commented upon. There was no error in presenting some of them in the form of questions. It was well calculated to present to their consideration the precise points in controversy. The facts were stated in a clear and impartial manner. The evidence of the experts and the positive and negative testimony of each was fairly contrasted. The contradictions and improbabilities of much of Gross's evidence were fully stated.

It is not necessary to refer to the various assignments more in detail. We have examined all of them. The court very carefully and correctly instructed the jury that they were the judges of the credibility of witnesses, and as to the weight they should give to the opinion of the court on questions of law. The case was well tried and with due regard to the rights of the accused. We find no error in the record.

Judgment affirmed, and it is ordered that the record be returned for due execution of the sentence.