## STATE v. COLEMAN.

1. The examination of a juror on his *voire dire* should properly be conducted by the court.
2. It is for the Circuit judge to decide whether a juror is indifferent or not. In this case, the judge did not abuse his discretion in permitting to be sworn a juror, who stated on his *voire dire* that he had read the newspaper accounts of the crime—had neither formed nor expressed any opinion of the guilt or innocence of the prisoner at the bar, but had said that "any man who commits such a crime should be hanged," and, further, "that a man committing so shocking a crime as this was reported to be, did not deserve a trial by jury."
3. The trial-judge refused to permit defendant's counsel, in a murder trial, to read to an expert what had been said by a physician proved to be high authority on the subject of *transitoria mania*, as found in a medical journal, and then to ask such witness whether he concurred in those views, but counsel was permitted to frame from such publication questions for the witness as to his own opinions, and also to read to the jury at pleasure from standard authors upon medical jurisprudence. *Held*, that there was no error in the judge's ruling.
4. It is not proper to ask physician-experts their opinion of the prisoner's sanity from the testimony given in the case on trial, but they may be asked their views generally, or with reference to a similar case hypothetically stated.
5. The judge refused to charge the jury "that if they believe that the prisoner had no motive for killing the deceased, as shown by words or deeds previous or subsequent to the act, then they must acquit him on the ground of want of criminal intent," and instead charged "that the intent must exist and be shown to exist, but the motive may not be discovered ; the absence of a motive revealed is a circumstance to be duly considered in weighing the question of guilt." *Held*, that in this there was no error.

6. The judge refused to charge the jury "that it is the duty of the State to prove that the prisoner was of sound mind when he committed the act, and if, from the evidence, the defense create a reasonable doubt about the prisoner being sane, you must give the prisoner the benefit of that doubt," but on the contrary charged "that the burden of proving soundness of mind is not, in the first instance, on the State; it is a defense, and if established, will prevail when interposed by defendant; the jury must be satisfied of defendant's sanity before they can convict; the defendant is entitled to be acquitted if reasonable doubt of his capacity to commit crime is raised in the minds of the jury, but that the doubt to be raised in favor of the prisoner must be a serious, well-founded, substantial doubt." *Held,* that in this there was no error.

7. The Circuit judge is authorized to send to the asylum any person who, upon trial before him, proves to be of unsound mind, but he is not required to do so.

8. Where insanity is the defense, the judge did not err in instructing the jury that if a reasonable doubt is raised in their mind as to defendant's capacity to commit crime, their verdict must be "not guilty," but not necessarily "by reason of insanity."

9. The mere plea of insanity does not render the atrocity of the deed evidence of the insanity of the perpetrator.

Before Hudson, J., Richland, April, 1883.

This was an indictment against James Coleman for the murder of Sarah Willis, in the city of Columbia, on December 28th, 1882. The facts of the case are thus reported by the presiding judge:

The testimony disclosed the fact that the defendant was the husband of a sister of Sarah Willis; that he was in the habit of visiting the house of Sarah, and was, by her and her husband, received with the freedom and confidence usually accorded to a brother-in-law. With Sarah there lived an unmarried sister, by name Mattie Faust, a young and comely, bright-colored woman. On December 28th last, Sarah's husband was absent on a visit to relatives in the county of Barnwell. On the evening of that day the defendant called at her house, in the yard of Professor Davis of the South Carolina college, just as Sarah and her sister were about to go out to attend a fair in the city. The defendant was kindly welcomed, and gladly requested to remain and care for the house during the absence of Sarah and her sister, which he consented to do.

They were at the fair until after midnight, and on returning found Coleman awaiting them. The unmarried sister, feeling fatigued, retired to bed, leaving Sarah and the defendant sitting by the fire, she having slipped off her shoes and unbuttoned her dress. The sleep of Mattie Faust was so profound that the noise which must have attended the killing of her sister did not awake her. About two or three o'clock A. M. she was aroused from sleep by finding a man in bed with her. She asked who it was, and the reply was, "It is Tom Brown." At this she cried aloud for her sister, when he seized her by the throat and threatened to kill her if she made further noise. She became passive, and he had connection with her. Having discovered that it was the defendant, she inquired for her sister, and was told that she was in the adjoining room with a man. Mattie attempted several times to quit the bed to find her sister, but he prevented her doing so, and several times himself arose and stepped out the door, when she could hear him scraping on the ground. The house had two rooms, each of which was entered from a door opening on the yard. On returning to the bed the defendant betrayed restlessness and said that he felt as if he was going to be hanged, and that she, Mattie, would be the cause of it.

Time passed on in this way until about dawn, when Coleman having again arisen and stepped out, Mattie sprang out of the house and saw him rapidly retreating. Looking into the next room through a window she saw her sister lying on the floor dead. The alarm was given, and upon the arrival of others the shocking scene was revealed. From the pool of blood in the room where Mattie slept, and the wounds upon the head of deceased, it was evident that with an axe or hatchet the defendant had cut Sarah down in the presence of the sleeping sister, and had then dragged the dead body into the yard, and thence along the ground to the next door of the house, and then lifted or dragged it into the adjoining room and there left it. Her head was deeply cut in several places. Having done this horrid deed, fiend-like, he repaired to the bed of Mattie and had carnal knowledge of her forcibly and against her will, all stained with the blood of his innocent victim, whom, in all probability, he

slew in cold blood for refusing to prostitute herself to his brutal lust.

Such is a brief narrative of this revolting homicide. So clear and convincing was the proof that the defendant after arrest and imprisonment did not, could not deny it, but freely and voluntarily confessed it, and said that he had no excuse for the act, except that he was instigated thereto by the devil. The attorney for the prisoner very prudently made no effort to deny nor disprove the fact of the killing, nor the circumstances attending it; but relied on the defense of transitory or temporary insanity. To establish this, he placed witnesses on the stand, including the parents and relatives of the defendant, who gave a history of his ills and ailments from childhood up to manhood.

The purport of this testimony was that James had, in boyhood, been at times affected with a strange hurting in his head, when he would pull his hair and complain of something moving in his head. He would, at times, awake at night with a scream, as if in a nightmare, and be much frightened. He talked in his sleep, and often in the daytime would talk to himself. At times he walked in his sleep. While a youth, he once lived at a Mr. McTeer's in Hampton county, when he became ill, and for a week was, in the opinion of Mr. McTeer, not in a sound state of mind. At school he was taciturn, and not inclined to play with the other children; but he learned as other children, and kept well up with his classes. On one occasion, during his career, he manifested a desire to get hold of a gun, to kill either himself or some one else. Such was the current of testimony regarding the defendant's mental condition and manifestations, running through a period of some years from boyhood to manhood. He is apparently twenty-four or twenty-five years of age.

Several eminent medical experts were examined by the defense upon the subject of insanity in general, and particularly transitory insanity. They were present throughout the trial, and heard all the testimony for the State and the defense, and gave the trial, in its progress from beginning to end, very close attention, and closely observed the defendant. These experts are Drs. Trezevant, Taylor, Talley, Green and Heinitsh. All these

to whom the question was put very promptly stated that they could discover nothing in all the testimony indicating that the defendant was subject to transitory insanity, and without hesitation gave it as their opinion that at the time he committed the homicide he was sane and morally responsible. The jury, with little hesitation, arrived at the same conclusion, and found the defendant guilty. I have no hesitation in saying that I fully concur in the correctness of the verdict, as the defendant signally failed to make out his defense of insanity.

Other matters are stated in the opinion of this court.

*Mr. D. A. Straker,* for appellant.

The juror should have been excluded. *Hamilton's Metaphysics,* 133, 424; *Reid,* 331, 337; 74 *Pa.* 458; *Thomp. & Mer. Jur.,* §§ 214–217; *Whart. Cr. L.,* § 2981; *Burr Tr., vol. I., p.* 416; 4 *Wend.* 241; 1 *Johns.* 316; 12 *Geo.* 444; *Prof. Jury Tr.,* §§ 176, 181, 183. Error in the use of discretion by the Circuit judge is reviewable. 16 *S. C.* 460; *Rap. & Law, L. Dict., tit. Discretion;* 18 *S. C.* 315; *Thomp. & Mer. Jur.,* §§ 206–211; 5 *Cal.* 347; 13 *Sm. & M.* 189. In excluding the extract from the medical journal, the judge erred. *Whart. & S. Med. Jur.,* §§ 266, 279.; *Whart. Ev.,* § 438; *Beck Med. Jur.* 969. Exceptions three and five are well taken. The words "motive" and "intent" are synonymous in their relation to crime. 1 *Bish. Cr. L.,* § 370; 1 *Arch. Cr. Pl.* 801; 49 *N. Y.* 137; *Whart. &. S.,* §§ 710, 711; 43 *Conn.* 514. If not guilty by reason of insanity, the verdict should have been so expressed. *Gen. Stat.,* § 1589; 50 *N. H.* 369. The plea of insanity being interposed, the burden of proving soundness of mind was on the State. 31 *Am. Rep.* 360; 1 *Arch. Cr. Pl.* 35, *note* 1; 16 *N. Y.* 58; 31 *Ind.* 485; 17 *Mich.* 9; 31 *Ill.* 393. The judge erred in drawing a distinction between a reasonable doubt, and a serious, well-founded, substantial doubt. *Cent. L. J., Nov.* 28*th,* 1883, *p.* 408. In charging upon the atrocity of the deed, the judge charged on the facts. 15 *S. C.* 392; 1 *Bish. Cr. L.,* § 482.

*Mr. Solicitor Bonham,* contra.

As to first exception, he cited 8 *S. C.* 239 ; 17 *Hun* 410 ;
48 *Iowa* 530 ; 19 *Hun* 424 ; 66 *Ind.* 94. The question to Dr.
Green was properly ruled out. 54 *Wis.* 528 ; 48 *Mich.* 490 ; 41
*Am. Rep.* 61 ; 42 *Id.* 477 ; 60 *Cal.* 581. There is a great dif-
ference between " motive " and " intent." The defendant has no
reason to complain as in his fifth exception. 2 *Crim. L. Mag.*
44 ; 4 *Id.* 32 ; 63 *Ala.* 307 ; 10 *Cl. & F.* 200 ; 1 *Car. & K.* 130 ;
*Russ. Cr. & M.* 525 ; *Rosc. Cr. Ev.* 975 ; *Whart. Cr. Ev.*, § 340 ;
*Whart. Hom.*, § 668 ; 2 *Greenl. Evid.*, § 373. As to exception
sixth, see *Arch. Cr. Pl.* 30 ; 10 *Cl. & F.* 200 ; 12 *Ohio* 483 ; 1
*Strobh.* 479 ; 87 *N. Y.* 377.

March 1st, 1884. The opinion of the court was deliv-
ered by

MR. JUSTICE McGOWAN. The defendant Coleman was in-
dicted for the murder of one Sarah Willis. In impaneling the
jury for the trial of the cause, one P. F. Toland, upon being
presented, was ordered by the State to stand aside. When the
panel was exhausted, he was recalled and again presented,
the State and the prisoner having in the meantime exhausted
their peremptory challenges. Upon the second presentation the
juror, at the request of the prisoner's counsel, was sworn and
examined upon his *voire dire.* The judge reports that " the
prisoner's counsel was allowed to examine him, and proceeded to
do so. The juror admitted that he had read the newspaper
accounts of the crime shortly after it occurred, but said that he
had neither formed nor expressed any opinion of the guilt or
innocence of the prisoner at the bar. The counsel then asked
him if he had not said that ' any man who commits such a crime
should be hanged.' The juror replied that he had. I remarked
at this point that the question was an improper one, and that
any other answer would have been improper, because, had the
juror answered that he had said that one committing murder
should not be hanged, he would have been disqualified. The
juror here volunteered the remark that he had said that a man
committing so shocking a murder as this was reported to be, did
not deserve a trial by jury. The defendant's counsel said, ' You
are in favor, then, of lynch law.' He replied, ' Yes, when the

circumstances demanded it.' In answer to questions by the court, the juror stated very positively and earnestly that he had no bias for nor prejudice against the prisoner; that he stood entirely indifferent—would be governed altogether by the law and the testimony, and could and would give him a fair trial." The judge directed him to be sworn, and the defendant's counsel excepted.

After the evidence for the State was closed, the defendant's counsel announced that the defense was insanity; that the prisoner was of unsound mind at the time of committing the offense. In order to make out this defense, he offered as a witness Dr. Frank Green, and proceeded to interrogate him as follows: " *Q.* Are you a practicing physician? *A.* Yes. *Q.* How long have you been practicing medicine? *A.* Ten years. *Q.* During that time, had you made the study of the mind a specialty? *A.* Yes. *Q.* Have you been connected with any institution for the insane enabling you to do so? *A.* Yes—for several years in an insane asylum at New York; also for two years I have been connected with the asylum for the insane in the city of Columbia, South Carolina. *Q.* Will you say whether or not *transitoria mania* or impulsive insanity is recognized by the best medical authorities? *A.* It is. *Q.* Do you regard Drs. Ray, Hammond, Beauford, Debergie and Jarvis as recognized authorities on the subject of *transitoria mania?* *A.* Yes. *Q.* I will read what Dr. Jarvis said in the American Journal of Insanity, July, 1869, and published at Utica, on this question; say whether or not the same is your view?"

Just here the solicitor interposed objection, on the ground that a printed pamphlet could not be read in the manner proposed because there was no proof of its authenticity. The judge reports : " I refused to allow such a course of examination for many reasons too obvious to dwell upon. I remarked that in such a course of examination the counsel would make the testimony of the New York expert in that case testimony in the one before the court; that the question was leading, as it plainly suggested the answer, and that for these and other reasons he could not be allowed to read the extract. I informed the counsel that he might use the pamphlet for the purpose of framing

therefrom proper questions, but that all questions must be framed with a view to elicit from the witness what he (the witness) knew, and not with a view to tell the witness what other experts had said, in order to get the witness to concur. By such a course a very unlearned expert could be made to give very profound and learned answers to questions on insanity. I also informed the counsel that, in addressing the court or jury, he would be permitted to read at pleasure from standard authors upon medical jurisprudence, their views upon insanity, and the law applicable thereto. That such works were authority in our courts." The counsel excepted.

After the testimony was offered the counsel for the prisoner made many requests to charge, all of which received careful consideration and were ruled upon. Some of them were charged as proposed, some were charged in modified form, and others were refused. Under the charge, the jury found the defendant "guilty," generally, and he appeals to this court upon various grounds, which are all fully set out in the " Case," and need not incumber this opinion by being repeated here. It will only be necessary to notice such of them as are formally embodied in the exceptions. We will not take up the exceptions in the order in which they are stated, but, to avoid repetition, dispose of the points made, in what seems to us their proper order.

First. Exception one alleges that it was error of law in the Circuit judge to admit Toland to be sworn as a juror in the case. It is not alleged that there was any cause for his exclusion, unless it arose out of his own statements when examined on his *voire dire.* This court has held that " whether a juror is indifferent in a cause is a matter of fact to be finally determined by the Circuit judge. As a matter of law, a juror is not incompetent who has formed an opinion from what he has read in the newspapers, or heard, but whose mind would not be thereby influenced, who is not sensible of any bias or prejudice, and would be governed by the evidence." *State* v. *Dodson,* 16 *S. C.* 453 ; *State* v. *Coleman,* 8 *S. C.* 239. This would seem to dispose of the question made here, but as the case is a capital one and the counsel for the prisoner earnestly urged that the ruling of the

judge below was an abuse of the discretion allowed him to the extent of being a violation of law, we will consider it.

It was formerly held in this State that the prisoner did not have the right to examine a juror on his *voire dire* to ascertain whether he had formed or expressed an opinion as to his guilt. His right to twenty peremptory challenges was regarded in practice as a very adequate security against being tried by a jury which had prejudged his guilt. *State* v. *Baldwin,* 1 *Treadw. Con. R.* 289 ; *State* v. *Sims,* 2 *Bailey* 33. But, to give effect to the declaration of the constitution, that every person shall have the right to a trial " by an impartial jury," the act of 1871, re-enacted in the general statutes as section 2261, provides that " The court shall, on motion of either party in suit, examine on oath, any person who is called as a juror therein, to know whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein, and the party objecting to the juror may introduce any other competent evidence in support of the objection. If it appears to the court that the juror is not indifferent in the cause, he shall be placed aside as to the trial of that cause," &c.

The object of the act was manifestly to secure " an impartial jury," and the method adopted to ascertain whether the juror stands indifferent was for the judge to interrogate him on certain points and decide the question. As was said by the court in the case of *State* v. *Coleman, supra,* " The presiding judge must determine on the character of the questions proposed and when the examination shall cease. In fact, the allowance of the examination by the counsel in place of the court, was an indulgence." It seems to us important, for several reasons, that this requirement should be observed in practice. When should one summoned as a juror, be held as disqualified for having formed or expressed an opinion as to the guilt of the prisoner ? Hawkins states the rule thus : " When he hath declared his opinion beforehand that the party is guilty, or will be hanged, or the like." Mr. Bishop says this rule has been more or less expounded and qualified in the States. " It has therefore no form which may be fitly termed the modern American doctrine. * * * In the nature of things

it is impossible, in any case, to obtain a jury, the mind of every one of whom shall be free from all that might incline it more to the one side than the other. Hence, in looking for rules, the court shall be guided as well by the consideration of what can be as by the dictates of abstract justice. It may only demand that a dis-- qualification, to prevail, should be of some standard magnitude, dictated by practical wisdom. Now, the terms of our constitutions differ, so that what would be admissible under one may not be under another. But in none is it declared that the jury shall be an impossible one—of perfect men," &c. 1 *Bish. Cr. Pro.,* §§ 909 and 910.

The juror in this case admitted he had said that "any man who commits such a crime should be hung," and "that a man committing so shocking a murder as this is reported to be, did not deserve a trial by jury." These are strong expressions, not, however, directly in reference to the prisoner's guilt, but on the contrary, general, and pointing rather to the horrible character of the crime as stated. Considered in reference to the prisoner personally, they may be regarded as hypothetical in character; that is to say, if the facts are as stated, and the deed was done by one responsible for his act. Thus understood, they did not necessarily disqualify the juror. "A mere hypothetical opinion or impression, proceeding from no ill-will, is not alone cause for rejecting a juror." *People* v. *Symonds,* 22 *Cal.* 349. "An opinion merely hypothetical, and depending on the truth of rumors, or information, does not disqualify." *Epes' Case,* 5 *Gratt.* 676. "A juror, on a trial for murder, stated on his *voire dire* that he had not heard the matter talked over outside of his family; but he had read newspaper accounts of it, from which he had formed an opinion, which he then held, and which it would require evidence to remove; but that, notwithstanding such opinion, he could hear the evidence and try the case fairly and impartially. *Held,* that a challenge for cause was properly overruled." *Manke* v. *People,* 17 *Hun* 410, (and see a number of cases from most of the States in *note* to § 912, 1 *Bish. Cr. Pro.*)

In all these cases, there is concurrence in the view, that the Circuit judge is " the trier " to decide the question, and we can-

not say that in admitting Toland to be sworn, the Circuit judge abused that discretion in this case.

Second. Exception two charges error "in not allowing the prisoner's counsel to read extracts from medical authorities on insanity as found in a printed pamphlet, and to propose questions to medical experts thereon." There seems to be some misapprehension on this subject. The Circuit judge reports that he refused the counsel permission to read what was said by a distinguished expert upon the trial of Fanny Hyde, charged with the murder of George W. Watson before a court in New York, and having read his testimony, to ask the witness whether he concurred in those views. The judge says: "I informed the counsel that he might use the pamphlet for the purpose of framing therefrom proper questions, but that all questions must be framed with a view to elicit from the witness what the witness knew, and not with a view to tell the witness what other experts had said, in order to get the witness to concur. I also informed the counsel that, in addressing the jury, he would be permitted to read at pleasure from standard authors upon medical jurisprudence their views upon insanity and the law applicable thereto," &c.

It thus appears from the official report, which alone must be our guide, that in fact the only cause of complaint relates to the manner of conducting the examination and interrogating the witness. Permission was given to use the pamphlet for the purpose of framing proper questions, but not to read what was said and then ask the witness whether or not he concurred in those views. It is elementary that, "in the direct examination of a witness, it is not allowed to put to him what are termed leading questions, that is, questions which suggest to the witness the answers desired. * * * Questions are also objectionable as leading, which, embodying a material fact, admit of an answer by a simple negative or affirmative." 1 *Greenl. Evid.*, § 434. We understand that an expert may be examined as to how far standard works sustain or conflict with his opinion, but we do not see that such indulgence dispenses with the necessity of reaching his own opinion in the regular way. *People* v.

*Wheeler,* 60 *Cal.* 581; *People* v. *Hall,* 48 *Mich.* 490; 42 *Am. Rep.* 477:

While upon the subject of the testimony of scientific experts it may not be improper to say, that their testimony consists of judgment in relation to matters not supposed to be familiar to the jury, and should be given in the abstract rather than in the concrete upon the facts proved, and not the general merits of the case, though they may give an opinion upon a similar case, hypothetically stated. 1 *Greenl.,* § 440. It was, therefore, not in accordance with the strict rule applicable to such testimony, when Drs. Trezevant, Taylor, Talley, Green and Heinitsh, who heard all the facts developed on the trial, stated "That they could discover nothing in all the testimony indicating that defendant was subject to transitory insanity, and, without hesitation, gave it as their opinion, that at the time he committed the homicide he was sane and morally responsible." The subject of the mind and its influence upon the body, is very difficult and obscure, to the most learned—a region of twilight, subjecting the wise and the unwise, the philosopher and the judge alike to a reverential humility, and we think it would have been safer for the experts to have given their views generally, or with reference merely to a hypothetical case. But no objection or exception was made at the trial to the manner in which the evidence was stated, and it is referred to here only through abundance of caution.

Third. Exceptions three and five complain that the judge refused to charge the jury as requested, "That if they believe that the prisoner had no motive for killing the deceased, as shown by words or deeds previous or subsequent to the act, then they must acquit him on the ground of want of criminal intent," but instead charged the jury "That the intent must exist and be shown to exist, but the motive may not be discovered; the absence of a motive revealed is a circumstance to be duly considered in weighing the question of guilt." There is no necessity for confounding the terms "intent" and "motive." We suppose there can be no doubt about the prisoner's "intent" to kill the deceased. He did it with an axe, in the most brutal manner, in her own house, dragged off the body and then fled.

It would be going very far to assume that in this sense the "intent" did not exist—that he did not intend what he actually did. But can it be supported, either by reason or authority, that such intent to kill, carried into effect, must be held to be wanting in criminality if, so far as can be shown by words or deeds, there was no rational motive for the killing? There may have been some motive deep down in his heart.

It would be alarming, indeed, if no one could be found guilty for committing the most horrible deed, unless some external evidence could be shown of the motives which prompted him. If one, not shown to be insane, were to shoot into a crowd and slay another who was a stranger to him, he would certainly be convicted of murder, on the ground of malice against all mankind. Blackstone says: " *Malice prefence, malitia precogitata,* is not so properly spite or malevolence to the deceased, in particular, as any evil design in general—the dictate of a wicked, depraved and malignant heart." The whole class of cases in which malice is implied rests on the principle that " all homicide is presumed to be malicious, until the contrary appeareth upon evidence." We suppose that the perpetrator of every great crime, at the moment of the act, is, in one sense, more or less insane— demented by some raging passion or driven by some wicked impulse; but such want of self-control alone may not amount to that incapacity to distinguish between right and wrong, which the law humanely recognizes and covers with its mantle of charity. Upon this subject we think there was no error below.

Fourth. Exceptions four, six and seven complain that the judge refused to charge as requested, " that it is the duty of the State to prove that the prisoner was of sound mind when he committed the act, and if the defense, from the evidence, create a reasonable doubt about the prisoner being sane, you must give the prisoner the benefit of that doubt;" but, on the contrary, he charged " That the burden of proving soundness of mind is not, in the first instance, on the State. It is a defense, and, if established, will prevail when interposed by defendant. The jury must be satisfied of defendant's sanity before they can convict. * * * That the defendant is entitled to be acquitted if reasonable doubt of his capacity to commit crime is raised in

the minds of the jury.   *   *   *   But that the doubt to be raised in favor of the prisoner must be a serious, well-founded, substantial doubt," &c.

As we understand it, these rulings were not inconsistent with the requests of the defendant. There seems to be a difference in the authorities as to the nature of the issue when the defense of insanity is made, whether the defendant must make out his insanity or the State must prove his sanity beyond a reasonable doubt. But all the authorities agree that every man is presumed to be sane, and that, as a consequence, it is not incumbent on the State at the outset to prove it. Some of them, however, hold that, once the issue is made and evidence offered tending to shake the presumption, then the State must establish sanity like any other material point in dispute. This view the Circuit judge adopted. He held that, on account of the presumption of sanity, the burden of proving soundness of mind is not, in the first instance, on the State, but that insanity, if established, will prevail. He reports that he charged, " That the jury must be satisfied of defendant's sanity before they can convict him [and must give him the benefit of every reasonable doubt on this point]. The words in brackets are not on my notes, but they were spoken, and defendant's proposition was charged in full against a strong New Jersey case, cited by the solicitor to the contrary, in which the learned judge holds that insanity must be fully established in order to prevail as a defense. I held with defendant's proposition, that if the evidence of insanity was such as to create a reasonable doubt of the sanity of the prisoner, he should be acquitted." This ruling was certainly more favorable to the prisoner than that in our own case of *State* v. *Stark,* 1 *Strobh.* 506, which was a very remarkable case, somewhat like this but stronger. It was there held, after mature consideration, " That the positive existence of that degree and kind of insanity that shall work a dispensation to the prisoner, in a case of established homicide, is a fact to be proved, as it is affirmed by him, to the satisfaction of the jury, who are the safest and proper arbiters of the question."

As to the form of the verdict, section 1589 of general statutes does " authorize " a judge " to send to the lunatic asylum any person who shall, upon trial before him, prove to be *non compos*

*mentis.*" This is not mandatory, and we know of no law or practice which would permit this court to hold a Circuit judge in error for charging a jury to render a general verdict of guilty or not guilty of the offense charged, or for instructing them that the phrase "reasonable doubt," used in the books, means a "serious, well-founded, substantial doubt."

Fifth. Exceptions five and eight complain that "the judge erred in charging 'That the atrocity of the deed was presumption of malice, as where a person kills a child, or one unoffending, the law presumes malice. The law truly applied to a case in which the evidence shows, or even the plea of insanity is set up, makes the reverse of his Honor's ruling only true. The atrocity of a deed may be commented on as matter of law, but the deed and its character was a fact for the jury.' Moreover, the general rule will not apply, for the atrocity of the deed, when the plea of insanity is set up, is presumptive of innocence and not of malice, for the law presumes no sane man to act but according to the ordinary course of human conduct." *Bish. Cr. L.*, § 482.

It may be true that, where there is evidence of insanity at the time of the commission of the act, the atrocity of that act may not, as in the ordinary case of a sane man, afford evidence of malice. But it seems to us that it would be a dangerous doctrine to allow the mere plea of insanity to reverse, entirely, the general well-established rule, so as to make the atrocity of the deed itself evidence of the innocence of the perpetrator. In this respect, also, the case is like that of *State* v. *Stark, supra.* In its circumstances that case was, if possible, more wanton, unnatural and atrocious than this. Stark inhumanly butchered his unoffending wife and his two little children, and then made an unsuccessful effort to cut his own throat. In that case, as well as in this, the argument was most earnestly made that insanity was shown by the very wickedness and unexampled barbarity of the deed, but the court held that "Where no more than the homicide is proved the overwhelming barbarity of the act will not be admitted as a presumption of insanity; for, then, the more unnatural and brutal the crime, the stronger would become the ground of defense."

As I can say nothing more appropriate to the present case, I shall close this opinion in the touching words of Judge Withers, who delivered the judgment of the old Appeal Court in that case : " But, upon a review of the whole case, what are the considerations really relied on to establish the insanity of the prisoner? 1. The overwhelming barbarity of the act. The prisoner has put to death the unoffending mother of his children, and those children themselves still more unoffending. It is quite clear that if we admit the dispensing power of such reasoning, no man can ever be convicted for the murder of his family, if no more can be proved than the homicide itself, for the more atrocious and brutal the crime, the stronger would become the ground of defense. Nor should we find encouragement for this in the courts of England, for it is but recently (see the case of *Regina* v. *Higginson*, 47 *Eng. Com. L.* 129,) a prisoner was on trial for the murder of his little son, and the question being whether he had first killed him or had buried him alive, he rose in court and said, ' I buried him alive.' No presumption of insanity was urged, and he was convicted. * * . * Our painful conclusion is, that there is nothing to justify the interference of this court, and that, though we can not certainly prove the prisoner's sanity, the jury have found it ; and having had a fair trial, with all the humane allowances of the law, before a jury of his peers, their solemn arbitrament must seal his fate."

The judgment of this court is that the judgment of the Circuit Court be affirmed, and that the case be remanded to the Circuit Court for the purpose of enabling that court to assign a new day for the execution of the sentence heretofore imposed.