WILEY H. NORWOOD v. THE STATE.

No. 4262.    Decided November 16, 1916.

Rehearing granted February 14, 1917.

1.—Murder—Manslaughter—Motive—Practice on Appeal.

Where defendant was convicted of murder, and contended that the evidence was insufficient because no motive was shown except an insult to his wife, and

that, if guilty, the offense would be manslaughter this court must take all the incriminating circumstances and determine therefrom the sufficiency of the evidence and can not be governed by testimony which might authorize an acquittal or a lower grade of offense and the facts being a question for the jury, there is no reversible error. Following Kearse v. State, 68 Texas Crim. Rep., 633, and other cases.

### 2.—Same—Function of the Jury—Rule Stated.

Many things occur in the trial of a cause in the presence of the jury that do not appear in the record of the court; reference to the manner of witnesses, their hesitation, and a thousand things, which may affect their credibility, are the subject of comment as matters happening in the presence of the jury which can not appear in the printed record. These are all questions of fact to be settled by the jury and not by this court. Following Reesman v. State, 59 Texas Crim. Rep., 430, and other cases.

### 3.—Same—Manslaughter—Adequate Cause—Rule Stated—Motive.

In order to reduce homicide from murder to manslaughter, the same must be committed under the immediate influence of sudden passion arising from adequate cause, etc.; that the killing must be directly caused by the passion out of the provocation, and it is not enough that the slayer's mind is merely agitated by passion arising from some other provocation, and without this, an unlawful killing can not be reduced from murder to manslaughter, and it is never indispensable to a conviction that a motive for the commission of the crime should appear.

### 4.—Same—Argument of Counsel—Husband and Wife—Cross-examination.

Where, upon cross-examination of defendant's wife, the State's counsel asked her to relate the conversation between her and her husband after he returned with the gun, and just before he left his house to kill deceased, and this matter was not brought out in any way in her examination in chief by the defendant, and the court had sustained an objection thereto, it was reversible error for the district attorney, in his closing argument, to say that on account of defendant's objection to this testimony the State was prevented from developing what was said between the defendant and his wife at that time and that the claim of insulting conduct by deceased to defendant's wife was a mere frame-up and not the motive for the killing. Prendergast, Judge, dissenting.

### 5.—Same—Husband and Wife—Confidential Communications.

Under article 794, Code Criminal Procedure, neither husband nor wife shall in any case testify as to communications made by one to the other, etc., and the statute therefor, directly and positively interdicts the use of such confidential communications, and the wife, when a witness for the husband, can not be cross-examined on matters about which she did not testify in her examination in chief to the extent that the State could so use the wife on such cross-examination as to convey to the jury the idea that, if permitted, the wife would testify against the husband, and counsel for the State can not complain of this rule in his argument. Following Brock v. State, 44 Texas Crim. Rep., 335, and other cases; and where he does the same is reversible error. Prendergast, Judge, dissenting.

Appeal from the District Court of Jones. Tried below before the Hon. John B. Thomas.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

· *J. F. Cunningham,* for appellant.—On the question of manslaughter: Chatam v. State, 57 Texas Crim. Rep., 442.

On question of cross-examination of defendant's wife and argument

of counsel: Marshall v. State, 78 Texas Crim. Rep., 451, 182 S. W. Rep., 1106; Black v. State, 79 Texas Crim. Rep., 628, 187 S. W. Rep., 332; Clark v. State, 23 Texas Crim. App., 260; Tally v. State, 48 Texas Crim. Rep., 474; Exon v. State, 33 id., 461, and cases cited in opinion.

On question of motive: Doss v. State, 43 Texas Crim. Rep., 551; Stewart v. State, 52 id., 273.

*C. C. McDonald*, Assistant Attorney General, for the State.—On question of adequate cause on ground of insulting conduct: Eads v. State, 76 Texas Crim. Rep., 647, 170 S. W. Rep., 145; Hicks v. State, 171 S. W. Rep., 755; Davis v. State, 155 S. W. Rep., 549; Redman v. State, 67 Texas Crim. Rep., 374; Rogers v. State, 67 Texas Crim. Rep., 467; Gillespie v. State, 53 Texas Crim. Rep., 167; Holcomb v. State, 54 id., 486; Jordan v. State, 62 id., 380; Oldham v. State, 63 id., 527; Davis v. State, 73 Texas Crim. Rep., 49.

PRENDERGAST, Presiding Judge.—Appellant was convicted of murder and his punishment assessed at fifteen years in the penitentiary.

Appellant earnestly contends that the evidence was insufficient to sustain a conviction for murder; that no motive was shown except an insult to his wife, and that if guilty at all his offense would have been manslaughter and not murder. When such contention is made the rule is, that in passing upon the question, this court must take all the incriminating testimony and all reasonable and proper deductions which may be drawn therefrom and determine from all this the legal proposition of whether or not the evidence was sufficient. In considering such question, the court does not look to the testimony which might authorize the acquittal of an accused nor the testimony which might be sufficient to justify the jury to find a lower grade of offense, but solely as stated to the incriminating testimony and reasonable and proper deductions which may be drawn therefrom.

It must also be borne in mind, "this court can not legally take the place of the jury and determine whether or not it will believe any witness or witnesses, and from all the testimony as put down on paper and sent to this court it would have found a different verdict from that of the jury and if so reverse the case on that account. (Kearse v. State, 68 Texas Crim. Rep., 633.)

Our statute expressly provides: "The jury in all cases are the exclusive judges of the facts proved and of the weight to be given the testimony" (arts. 786 and 734, C. C. P.), and it is the exclusive province of the jury to pass upon the credibility of the witnesses.

The jury consists of twelve intelligent, disinterested, impartial, unprejudiced and unbiased men, selected from different portions of the county and from different avocations, each of whom hears all the witnesses, sees them when testifying, observes their manner and the method of their examination, by the respective attorneys. The statement of facts brought to this court can not portray the manner, the acts and

the deportment of the witnesses, nor the manner of their examination and cross-examination. In addition, the trial judge hears, sees and observes all this, and he sustains the verdict of the jury in overruling the motion for a new trial. (Kearse v. State, supra.)

As stated by this court, through Judge Ramsey, in Reeseman v. State, 59 Texas Crim. Rep., 430, "many things occur in the presence of the jury that do not appear in the written record before us; references to the manner of witnesses, their hesitation and a thousand things which may affect their credibility are the subject of comment as matters happening in the presence of the jury which can not appear in the printed record."

It is also universal that "the jury have a right to determine from the appearance of the witnesses on the stand, their manner of testifying, their apparent candor and fairness, their apparent intelligence, and from all the other surrounding circumstances appearing on the trial, which witnesses are the most worthy of credit, and to give credit accordingly.

"That the jury are the judges of the credibility of the witnesses, and of the weight to be attached to the testimony of each and all of them; and the jury are not bound to take the testimony of any witness as absolutely true, and they should not do so, if they are satisfied from all the facts and circumstances proved on the trial, that such witness is mistaken in the matters testified to by him, or that, for any other reason, his testimony is untrue or unreliable.

"The jury are instructed that they are the judges of the credit that ought to be given to the testimony of the different witnesses, and they are not bound to believe anything to be a fact because a witness has stated it to be so—provided the jury believe, from all the evidence, that such witness is mistaken or has knowingly testified falsely." (Sackett on Instructions to Juries, p. 29; Melton v. State, 71 Texas Crim. Rep., 130.)

We can not undertake to give all of the testimony, but we will give in substance some of the most material. Appellant and L. H. Becker, the deceased, had lived neighbors about a quarter of a mile apart just a short time more than one year. Both were tenants on the farm of appellant's father. The deceased lived north, and one of the material witnesses, Mr. Lipham, lived west, of appellant about a quarter of a mile distant. The houses and premises of appellant and deceased were plainly visible, one from the other, a pasture with only some low, scattering mesquite intervening. There was a ravine, or branch, running about north and south, west of the premises of each, extending from one to the other and beyond each. A person could get into this ravine near appellant's and go from there in it to a point near deceased's house and behind his barn and then after emerging from the ravine continue behind deceased's barn so as to be unseen from deceased's house until he emerged very close thereto from behind the barn. This ravine was of sufficient depth to conceal a person all this distance.

About 11:30 a. m. on February 17th, and about an hour or a little longer before appellant shot and killed deceased, appellant was at work in his young orchard with trees of only one year's growth, watering his grapevines. This orchard was about fifty or sixty yards from his residence and extending perhaps a hundred yards further therefrom. While thus engaged, deceased went from his residence to where appellant was. At this time George Sampson, another neighbor, was talking to appellant. When deceased reached there the three stood talking for some minutes, when deceased said to appellant he wanted to borrow some tobacco and to know if he could get it. Appellant told him that he could—to go up to his house and get it from his wife, and that he was coming on. Mr. Sampson swore that there was nothing between the orchard and the house but a wire fence. Sampson and deceased left appellant together, Sampson going to his home in the neighborhood. Deceased went direct to the back door of appellant's house. Sampson saw him go to the west door and stop there. He said that when he saw deceased standing there appellant was going from the lot up to his house, and the lot was fifty or sixty steps from the house. When deceased reached appellant's back door he asked appellant's wife for the tobacco. She told deceased to hollo and ask appellant where the tobacco was, which he did. Appellant answered, telling where it was, and she then got and handed it to him. Mr. Gleaton was at work in Mr. Lipham's field, about 160 yards from where said parties were, and saw Sampson and deceased when they left appellant in his orchard. He swore that deceased went on to appellant's house, but just before reaching the west side, the house obstructed his view of deceased, but that he was near appellant's back door at the time; that in four or five minutes after this he saw deceased going from appellant's; that deceased was not out of his sight from the time he saw him going towards appellant's back door until he saw him emerge from behind the house again, going towards his home but four or five minutes. Appellant swore that it was some twenty to thirty minutes from the time deceased left him to get the tobacco until he went into his house and saw and talked to his wife. The other testimony was sufficient to show that the time was much shorter than he testified.

Appellant introduced his wife as a witness for him, had her sworn and testify in his behalf. In her direct testimony she swore that she was eighteen years old, married appellant November 26, 1914; that she saw deceased at her house about 11:30 o'clock a. m. before he was killed, the day he was killed; that he came to the house and in it, and asked for a can of tobacco, which he said her husband had told him he could get, and asked her where it was. She went to the buffet to get it, and deceased holloed and asked her husband where it was, and then followed her in the dining room and tried to put his arms around her; that she fought him off, told him that she would tell Mr. Norwood, and he told her that she had better not, and that he then left; that when he got outside of the door he asked her to meet him down at the straw stack at 3

o'clock that evening, and she told him she was not going, and he told her that if she didn't, at 6 o'clock there would be hell to pay around there. "That was all he said to me on that occasion." That on other occasions prior to that time he had said insulting things to her. One time in 1914, when she had spent the night at his house, she had to go home the next morning to do some 'phoning, and that he went with her to feed the stock, he said, and went in the house and opened it up. She told him he needn't mind that, and he said he wanted to see if there were burglars in the house. That she sat down to 'phone, and while 'phoning he put his arm on her shoulder, and she told him to remove it and get away, and he didn't bother her further until she finished 'phoning. That when she finished and turned around, he tried to pull her on the bed, and she fought him off and told him she was going to tell her husband, and "he told me if I did he would kill me." That he insulted her the day before he was killed while she was down in the field cutting stalks; that he tried to get her to go down in the bed of the creek with him, which she refused to do, and that he said that he had sent Mike, a Mexican, to talk to her husband so that he would not catch them; that she went on with her work, and when she came down the next time she met Mike, and he asked where her husband was, and she told him at the house, and he said he wanted to see him on some business, and he left; that the next time she came back down in a little while she met the Mexican coming back; that was about 2:30 o'clock in the afternoon of the day before deceased was killed; that there was a creek where deceased then was; she didn't know how deep it was, but "you can't see anybody down in there"; that she didn't go down in the creek with him.

On cross-examination, she said she first got acquainted with deceased in 1914; that he had approached her three times. "There might have been other times I have not told of." She then states that after at least the first claimed insult by deceased of her she went to his house while her husband was gone to Abilene and stayed all night at deceased's house and was over at his house just a few days before the killing; that she would go there to stay all night when her husband was gone; that she sometimes, when her husband was away, stayed at a neighbor's, Mr. Gleaton's, who lived about a half mile from her, but she never went to Mr. Lipham's to stay all night. She said she remembered that the district attorney came to her house after the killing. That when deceased was after the tobacco, as stated, he put his arms around her and tried to hug and kiss her, and she fought him away, and he wanted to know if she wouldn't go into the other room and have intercourse with him. She told him she certainly wasn't going. That she gave him the tobacco, and he left. She remained at the house and went on cooking her dinner, and was doing this when her husband came to the house. That her husband was at the orchard during all this time. That at least after that first claimed insult of her by deceased, she went to his house and stayed all night and visited there;

that she stayed all night there after Christmas, between Christmas and the day he was killed.

Appellant swore that when he came in his house from his orchard, he asked his wife where deceased was. She told him he had gone home. He then asked her about the dinner, and that she was not then crying; that soon afterwards he saw her crying and asked what was the matter; that she then told him of the said several insults by deceased of her. He said he asked her questions about deceased. That she had never told him of these claimed insults before. He said: "I don't think my wife told me anything more on the morning Becker was killed." But after she told him this, he got up and went across to Mr. Lipham's and borrowed a shotgun. Nowhere in his testimony, on either direct or cross-examination, does he say that what she told him that it in any way aroused any passion. Mr. Lipham, a disinterested witness, told what occurred when appellant came over to his house and borrowed his gun. There is no material difference between them on this subject. Appellant in his testimony substantially and fully corroborated what Mr. Lipham testified. The substance of Mr. Lipham's testimony was that he was out in his lot feeding his stock just at noon, when appellant came to him in his lot. Each spoke to the other and asked about one another. Lipham says he knew that appellant had been sick the week before, and he had been over to see him a few times while he was sick, and that on this occasion appellant said he was doing very well, just a little tired. That they started to his house, walking along talking. He didn't know what appellant was there for at the time, thinking he might have come to 'phone or go on to Mr. Gleaton's, and the witness told him about working on his tank and the trouble he was having with it, and that it was a big job; and that just before he got to the gate, defendant asked him if he had a shotgun. He answered that he had, and he asked if he could get it to kill some rabbits. That they then went in the house. He went and got the gun, set it down behind the door and appellant sat down, and they talked for some time about various business matters, and that when he got the gun for him he told him he had but few cartridges, and appellant said he had some over at his house which his father had left there. That in that talk appellant said to him the rabbits were thick late in the evening. He asked him to 'phone his father and tell him to come down there the next day. The witness asked him why he could not 'phone, and he replied that his father was out in the field, and he could not reach him at that time. They then talked about the appellant owing the witness for some telephone calls. They discussed that back and forth, and he said that he thought he only owed one, not two, that his wife had paid Mr. Bond for the other call, but that he would see her, and if she had not paid it, he would. Then he stated that he guessed he had better be going. That he got up, picked up the gun and walked out. The witness said: "I did not notice any excitement about him. There was nothing about him to attract my attention. I didn't notice any agitation about him."

Appellant says that he then went back to his own home with the gun, went in, got some buckshot cartridges, loaded the gun and walked over to the deceased's. That while he was gone, his wife left home and went over to Mr. Lipham's. He claimed that he walked straight across from his home to deceased's in plain open view of deceased's. The State's testimony was clearly sufficient to show that he was back-tracked from the place of the killing, which showed that he went from his house in said ravine, where he could not be seen from deceased's until he emerged from behind deceased's barn. The deceased, after he ate his dinner, went out with his little .22 target rifle behind his barn, not, however, where he could see appellant after he emerged from the ravine until he got right on him. John Perrin, a disinterested witness, who was at work at deceased's at the time, and who was out near the barn when appellant appeared upon the scene and saw the killing, said it occurred in this way: That when he first saw appellant emerge from behind deceased's barn, he had his gun in his hand. Appellant said, in his right hand lying across his left arm. Perrin said that he walked up in about sixteen feet of deceased, who was then standing, holding the little target gun down on his shoe. That deceased just said, "Howdy." Appellant made no reply to this, but walked on up a few steps further towards deceased, said to deceased: "Damn your soul, Becker," and shot him. That deceased immediately dropped his little target gun on the ground, staggered back and attempted, it seems, to run to get out of the way some ten steps, when appellant then fired a second shot into his heart, felling him, and that he died immediately. That deceased's wife, hearing the shooting, ran out of the house to them and asked appellant why he did it, and he replied because he had been *interfering* with his wife. The witness said he did not say that he had been *insulting* his wife, but *interfering* with her. That appellant then went and picked up the little target rifle where deceased had dropped it when first shot, and with both guns walked on off towards his home. Perrin's testimony was to the effect that at the time appellant shot deceased, deceased did not present his gun towards appellant, or attempt in any way to do anything to appellant. Appellant went on to his home, left the target rifle there and followed his wife over to Mr. Lipham's. Mrs. Lipham testified that appellant brought her husband's gun back at this time, and when he first came up he asked if his wife was there; that she hesitated to tell him that she was, and then he called his wife a time or two and handed the gun to her and said: "This is awful," and she replied, yes, it was an awful surprise to them. That he then called his wife again, and she came out in the yard where he was, and he said they must go. He then told his wife to go and 'phone his father to bring a lawyer; that his wife went in and got his mother on the 'phone, and he then told her to tell his mother, and his wife asked him: "Have you shot him?" and he said: "Yes," and she then told his mother over the 'phone that appellant had shot deceased. Appellant by his testimony stated in sub-

stance that he got the shotgun from Lipham and took it over with him to deceased's for protection and to see if he had any reason to offer why he had *approached* his wife; that he went there for an explanation, but he said after he got there he did not call upon deceased for any explanation. Substantially the whole point of his testimony then was that he shot deceased both times in self-defense. He did not say that he was mad or in any way outraged or any passion was aroused because of the claimed insults. He does say that he was excited at the time he shot deceased both times, but that excitement was caused, as he claimed, by deceased's attempt to present his gun towards him, and he thought he was going to try to shoot him.

The court gave a most full and complete charge in every way in appellant's favor and aptly and correctly submitted every issue that was in any way raised in appellant's favor. No complaint whatever is made of the charge of the court. The charge submitted manslaughter in his favor and in every possible way raised by the testimony. He also submitted self-defense without reference to threats, and then self-defense in connection with threats. He properly submitted murder correctly in every respect.

The statute is plain and clear that in order to reduce a homicide from murder to manslaughter, the homicide must be committed under the immediate influence of sudden passion arising from adequate cause; that under the immediate influence of sudden passion means, that the provocation must arise at the time of the commission of the offense, and the passion must not be the result of a former provocation; that the killing must be directly caused by the passion arising out of the provocation; and that it is not enough that the slayer's mind is merely agitated by passion arising from some other provocation. Without all this an unlawful killing can not be reduced from murder to manslaughter.

From all the testimony in this record we think it is without question that the jury were clearly authorized to believe: (1) That deceased had not insulted his wife. (2) That she did not, as he claimed, tell him at the time he claimed she did that the deceased had insulted her. It is very noticeable that in neither her direct nor cross-examination did she say directly or indirectly that she had told appellant of said insults when he claimed she did nor before he killed deceased. (3) That if she did tell him, what she told him was not the cause of any sudden passion on his part, and that the cause of the killing must have been from some other motive. The testimony of Mr. Lipham would exclude the idea of any sudden passion from any claimed insult by deceased of his wife. It would show that appellant had no passion arising therefrom.

Now as to the motive for the killing other than said claimed insults. This court, in Preston v. State, 8 Texas Crim. App., 30, on this subject said: "It is true that no motive on the part of appellant to commit this crime is shown, but it is never indispensable to a conviction that

a motive for the commission of crime should appear.  The People v. Robinson, 1 Park. Cr., ·655; Roscoe's Cr. Ev., 88.  Who with mortal ken can fathom the human heart and expose all its mysterious prompt-ings?  Crimes the most horrible are often committed without apparent motive save an insatiate deviltry which mocks at social restraint and recklessly defies the laws of God and man." · The Supreme Court of Missouri, in State v. Davis, 226 Mo., 493, 126 S. W. Rep., 470, said: "The fact of motive or the absence of motive is always an important inquiry in a case of this character; but the absence of an apparent motive is not conclusive of the innocence of the defendant.  Experience has demonstrated that the motives for crime are so numerous, so hid-den, and often so utterly unreasonable that it is impracticable to re-quire the State to make them manifest.  It does not follow that there was no motive because the State was unable to show any, or that the only one shown would seem inadequate; ·neither is it true that there can be no murder because there is no motive for it.  State v. Coleman, 20 S. C., 441; People v. Ah Fung, 17 Cal., 377; Clifton v. State, 73 Ala., 473; Preston v. State, 8 Texas Crim. App., 30; Green v. State, 38 Ark., 304; McLain v. Com., 99 Pa., 86; State v. David, 131 Mo., 380, loc. cit., 397, 398, 33 S. W. Rep., 28."  See also to the same effect White's Ann. P. C., sec. 1231; State v. David, 131 Mo., 380, 33 S. W. Rep., 32; Thurman v. State, 32 Neb., 225; State v. Hembree, 54 Ore., 463.  On cross-examination, when appellant was asked how many times he had been mad at deceased, he said that he didn't know of anything serious; that the only trouble between them came up when deceased tried to get some blank checks from him, and the deceased got angry about it; that deceased got mad because he thought he had the blank checks and just wouldn't let him have them.  Of course, deceased having been killed by appellant, could not tell what the motive was.

We therefore conclude that the evidence was amply sufficient to sus-tain the verdict for murder, and that the jury were not bound under the evidence to find him guilty only of manslaughter.

Upon cross-examination of appellant's wife, the State asked her to relate the conversation between her and her husband after he returned from Lipham's with the gun and at the time he got the cartridges with which he loaded it and just before he left his house to kill de-ceased.  Appellant objected to this, and the court sustained the objec-tions, and the wife was not permitted to testify to this.  The district attorney, in his closing argument, among other things, in substance, said to the jury that this tale about an insult to defendant's wife was the same old story that all defendants bring into court when they have committed murder, and that he wanted to tell them that the motive for this killing was not an insult to defendant's wife; that claim was a mere "frame-up" by the defendant; the motive of the killing was some-thing else, and further, that the appellant himself admitted that there had been at one time a difference or falling out between him and de-

ceased about a check book, saying to the jury: "You remember the testimony." Following this in his speech, he then said: "You remember, gentlemen, that we were not allowed to prove the conversation between defendant and his wife after he had gotten the gun and returned home. The defendant objected to this testimony and they would not let us develop what was said between the defendant and his wife at that time, because the defendant's lawyers objected to it." To this latter part only just quoted appellant objected, claiming that it was inflammatory, prejudicial and not a legitimate discussion of the facts of the case. The court said: "I don't know so much about that," and the district attorney then urged his right to comment on these matters, claiming that the authorities authorized him to comment on the failure of the defendant to put his wife on the stand. Whereupon, the court overruled the objections and permitted said argument to remain with the jury. Appellant requested no written charge of the court to disregard this argument.

This court has uniformly, in a great many decisions, held that when it developed upon the trial that an accused's wife must know some material facts and he fails to put her on the stand to testify in his behalf, or if after having put her on the stand he objects to her testifying to such material facts upon inquiry thereabout by the State, such action on his part is a proper subject of argument and comment by the prosecution before the jury.

This court, through Judge Willson, in Mercer v. State, 17 Texas Crim. App., 452, said: "We do not think the remarks of the prosecuting attorney, in his closing argument to the jury, which are complained of by the defendant, were beyond the scope of legitimate argument. It was disclosed by the evidence that the defendant's wife must have known important facts bearing directly upon the issue in the case, and that she was within easy reach of the process of the court. She could have explained fully the occurrence testified about by his two daughters when he got his gun and said he would blow his brains out. She could have testified, perhaps, to many other facts which would have shed light upon this horrible transaction. It was not within the power of the prosecution to adduce her testimony; because, being the defendant's wife, she was not permitted under the law to testify against him in this case. He alone could call for her testimony, and compel its production. Her knowledge of the facts, whatever that knowledge might be, was at his command—was within his reach,—and without he produced it, or consented to its production, it was a sealed book, which no human tribunal had the power to open against him. Under these circumstances we think the prosecuting attorney was justified in the remarks complained of, and that the court did not err in its action in relation thereto."

Again, this court, in Armstrong v. State, 34 Texas Crim. Rep., 248, said: "Nor, in our opinion, was any error committed by the attorney for the State animadverting on the fact that the defendant had refused

to permit Mrs. Armstrong, the wife of appellant, to be interrogated as to arms at her husband's house at the time of the robbery. The defendant put her on the stand, and had examined her as to other matters, when the State, on cross-examination, proposed to interrogate her on the matter stated. Defendant objected, and the court sustained the objection. The attorneys for the prosecution, in the argument, alluded to this as a suppression of evidence which it was in the power of defendant to produce, or to have permitted its introduction, but that he interposed an objection to it. If the effect of her testimony had not been criminative, unquestionably no objection would have been interposed, and in our opinion it was the subject of legitimate criticism," then Judge Henderson, who wrote that opinion, cited and quoted from the Mercer case, supra.

To the same effect are the decisions in McMichael v. State, 49 Texas Crim. Rep., 422; Tabor v. State, 52 Texas Crim. Rep., 387; Eggleston v. State, 59 Texas Crim. Rep., 542; Bost v. State, 64 Texas Crim. Rep., 464; Hall v. State, 22 S. W. Rep., 141; Harris v. State, 47 S. W. Rep., 643; Grammer v. State, 42 Texas Crim. Rep., 518; Smith v. State, 65 S. W. Rep., 186; Richardson v. State, 44 Texas Crim. Rep., 211; Locklin v. State, 75 S. W. Rep., 305; Battles v. State, 53 Texas Crim. Rep., 202; Burnam v. State, 61 Texas Crim. Rep., 616; Black v. State, 65 Texas Crim. Rep., 116; Bybee v. State, 74 Texas Crim. Rep., 211; Fondren v. State, 74 Texas Crim. Rep., 552; Gomez v. State, 75 Texas Crim. Rep., 239, 170 S. W. Rep., 711; Marshall v. State, 78 Texas Crim. Rep., 451, 182 S. W. Rep., 1106, 1108-1109. The case of Eads v. State, 74 Texas Crim. Rep., 628, 170 S. W. Rep., 145, is not applicable.

Appellant's bill presenting this question shows no error.

Appellant has other bills to questions asked his wife on cross-examination by the State. None of them present any error. The court really excluded some questions which he should have permitted the State to ask. It is unnecessary to state these matters. There is no error in the record.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

February 14, 1917.

DAVIDSON, PRESIDING JUDGE.—The motion for rehearing insists the court erred in the original opinion holding the argument of the district attorney was not improper. The bill of exceptions is substantially set out in the original opinion.

The court recognized the rule that confidential communications of the wife could not be used or introduced against her husband. The statute, article 794, C. C. P., provides that "Neither husband nor wife shall, in any case, testify as to communications made by one to the other, while married; nor shall they, after the marriage relation ceases, be made

witnesses as to any such communication made while the marriage relation subsisted, except in a case where one or the other is prosecuted for an offense and a declaration or communication made by the wife to the husband, or by the husband to the wife, goes to extenuate or justify an offense for which either is on trial." This statute, therefore, directly and positively interdicts the use of such confidential communication. This has been the law in Texas from the inception of our jurisprudence. It has been held that one spouse can not be used to impeach the testimony of the other, by proving contradictory statements, as this would be allowing testimony of communications made while the marriage relation subsisted between them. Roach v. State, 41 Texas, 261. The defendant's wife testifying for him can not be cross-examined relative to privileged communications. This was decided in Owen v. State, 7 Texas Crim. App., 329. In Spivey v. State, 45 Texas Crim. Rep., 496, it was held that in a murder prosecution it was shown that appellant had been laboring under an insane delusion that his wife had been intimate with deceased. His wife testified that after the arrest her husband told her that he wanted her to testify that deceased had made indecent proposals to her and that it would go hard with him if she did not. It was held this testimony was inadmissible, and should have been excluded. In McDonald v. State, 73 Texas Crim. Rep., 125, it was held that a statement by accused to her husband made on the latter's request as to the cause of the trouble between accused and the husband's wife, that accused had heard that the wife had had intercourse with other men, was privileged as a confidential communication. It has also been held in Pace v. State, 61 Texas Crim. Rep., 436, that a confession by a husband to his wife that he killed a man is absolutely privileged and can not be used, even though he be dead. Again, in Miller v. State, 65 Texas Crim. Rep., 302, it was held that confidential communications of a wife to her husband can not, after their divorce, be testified by him for the State on a prosecution of her. The same rule was laid down in Davis v. State, 45 Texas Crim. Rep., 292. It was held in that case that the testimony of a divorced wife to a threat made by her former husband against one with whose murder he is charged, in the course of a conversation with the witness prior to the divorce, is inadmissible. These cases are cited in connection with the statute quoted to show how that statute has been construed and held by the appellate courts in Texas. In fact, there could be legally no other sound construction, the words being express and implicit. The same rule was laid down in Gant v. State, 55 Texas Crim. Rep., 284; Gross v. State, 61 Texas Crim. Rep., 176; McDonald v. State, 73 Texas Crim. Rep., 125; and Eads v. State, 74 Texas Crim. Rep., 628. It is also laid down in Owen v. State, 7 Texas Crim. App., 329, that no inference of the truth of the facts sought to be elicited can be deduced where the question is privileged and unanswered. This language is used: "If the witness declines answering, no inference of the truth of the fact is permitted to be drawn from that circumstance. And no answer forced

from him after he has claimed protection can afterwards be given in evidence against him."

We have another statute, article 795 of the Code of Criminal Procedure, which provides that "The husband and wife may, in all criminal actions, be witnesses for each other; but they shall, in no case, testify against each other, except in a criminal prosecution for an offense committed by one against the other." This statute has been held to be mandatory, and that the wife will not be permitted to testify to criminative facts against her husband, and the judgment has been reversed where this has been permitted, although no exception had been taken. Among the cases so holding is Brock v. State, 44 Texas Crim. Rep., 335. That case has been followed in a number of opinions. Among the later cases is the Eads case, supra. That opinion was by Judge Harper and is here directly in point. Judge Harper uses this language: "However, we have never gone to the extent of holding that the State, while introducing its evidence, could so use the wife as to convey to the jury that if permitted the wife would testify against the husband and give the lie to the testimony introduced by him and testified to by him. Appellant had not closed the mouth of his wife— the law did that. Whether it is best for the law to do so may be a question about which minds differ, but we do not think anyone can question that it is the law that does so now. Neither, under the authorities, was it a provision of law which appellant could waive in behalf of the State, and counsel for the State was in error in so stating in the presence of the jury, and it was highly improper for him to ask appellant while on the witness stand 'if he, appellant, would waive his objections and permit his wife to testify in behalf of the State.' This was unfair cross-examination, for the law does not sanction him giving such waiver. He had killed his wife's father. If he did not desire his wife to testify that continued friendly relations might continue between her and her mother, this was commendable in him. If, on the other hand, his wife had turned against him because he had killed her father, the law says that the communications that took place between her and appellant should not be disclosed by the wife, and she can not testify against him, now that perhaps she feels unfriendly towards him because he is charged with killing her father. The State by its remarks and by its conduct could not have done otherwise than to have created the impression on the minds of the jury, that if 'appellant had not closed the mouth of his wife' she would have denied communicating any such threat to appellant as he testified to and the witness Hill testified she did communicate, and this was the object and purpose of the State in its conduct and by its remarks. Such evidence from that source, the law says, is inadmissible, and it was such error as ought to and will cause a reversal of this case." A portion of that opinion shows the condition of the case under which the matter arose. The State asked, in the Eads case, this question of appellant while he was testifying: "You know that under the law your wife can not testify

in this case unless you waive your objection to her testimony?" and when appellant's counsel objected to the question, State's counsel remarked: "All the authorities hold that a wife can testify unless the defendant objects to same—we can tender this woman as a witness, and if they object, her mouth is closed, but if they do not object, the law books say that the witness is competent." After appellant had testified counsel for the State called Mrs. Eads, appellant's wife, around and had her take the witness stand, and forced appellant then and there in the presence of the jury to object to her testifying; and, in his closing argument to the jury State's counsel argued to the jury that "appellant had closed the mouth of his wife by refusing to waive objections to her testimony with reference to the threats made which had been testified about, which she communicated to the defendant," etc. It was highly improper to permit State's counsel to call appellant's wife to the witness stand. Article 795 of the Code of Criminal Procedure provides that "the husband and wife may, in all criminal cases, be witnesses for each other, but they shall in no case testify against each other except in criminal prosecutions for an offense committed by one against the other." This provision of the statute is discussed at length in Brock v. State, 44 Texas Crim. Rep., 335, and the authorities digested, and it was there held that was a matter the person on trial could not waive, because the statute had provided that she was an incompetent witness; that she can be a witness for him, but not against him, and when called by him she can only be cross-examined about matters which he had elicited on direct examination. Of course, this would embrace matters which would tend to show that her testimony was false, but in no instance can the State first call the wife as a witness except in case of an offense committed by him against her. The rule announced in the Brock case, supra, has been adhered to in Davis v. State, 45 Texas Crim. Rep., 292; Spivey v. State, 45 Texas Crim. Rep., 496; Yeiral v. State, 56 Texas Crim. Rep., 267; Woodall v. State, 58 Texas Crim. Rep., 513.

That rule was recognized under article 795 that such testimony was inadmissible and would cause a reversal. Confidential communications under article 794 once made under the statute shall forever remain inviolate and privileged. If the testimony is not admissible, any attempt to prove it before the jury would be an attempt to violate its mandatory provisions. If it could not be introduced directly, it could not be so introduced or used indirectly. This would be an evasion of the statute to its destruction. The law closes the mouth of the spouse. It is not the accused who does so.

The Mercer case, 17 Texas Crim. App., 452, has been referred to and relied upon by the State. That opinion has, we think, no reference to article 794, even if it be correct in its enunciation. The question of privileged communications was not in that case.

The Armstrong case, 34 Texas Crim. Rep., 248, is not analogous, nor on the same question. The testimony there, however, was not con-

fidential communications. Moore's case, 45 Texas Crim. Rep., 234, was reversed because the State called the wife of the defendant to the witness stand and tendered her to the defendant as a witness.

The Eads case, supra, is in harmony with the statute in reference to confidential communications. The court recognized in this case that the wife could not testify to communications made to her by her husband immediately after the killing, because it was privileged as confidential. Had he ruled otherwise it would have been making the wife a State's witness with reference to such communications. This, of course, could not be done. In Gross v. State, supra, the matter was pretty fully discussed, and authorities reviewed. It was there held that upon trial of incest, to be reversible error to admit in evidence the contents of a letter which the defendant had written his wife wherein he implored her to get his daughter and her husband out of the way, as they could put him to death; and this, although the letter came into possession of State's witness with or without connivance of the wife, as the same was a privileged communication. This follows the rule laid down in Cole v. State, 48 Texas Crim. Rep., 439, and other cases cited in that opinion. See also Hearne v. State, 50 Texas Crim. Rep., 431. In Hearne's case letters seem to have been written by the husband to his wife, and the case was reversed because of the admission of those letters. From the Gross case, supra, this quotation is made: "The same rule has been laid down in Cole v. State, 48 Texas Crim. Rep., 439; Burke v. State, 15 Texas Crim. App., 156; Davis v. State, 45 Texas Crim. Rep., 292; Grant v. State, 55 Texas Crim. Rep., 284. In the latter case the court said: 'The privilege extends beyond dissolution of marriage relation by death or divorce. Ency. of Ev., pp. 196, 197; note 43 for collation of authorities. It includes letters from one spouse to the other.' Mitchell v. Mitchell, 80 Texas, 101; Mercer v. State, 40 Fla., 216; Midland Lumber Co. v. Kreeger, 52 Mo. App., 418; Com. v. Sapp, 29 Am. St. Rep., 405; Stein v. Bowman, 13 Peters, 209; Saunders v. Hendrix, 5 Ala., 224; 1 Greenlf. on Ev., secs. 254, 337, 338, and notes; Cook v. Grange, 18 Ohio, 526; Brown v. Wood, 121 Mass., 137; Maynard v. Vinton, 59 Mich., 139; Jacobs v. Hesler, 113 Mass., 157; Hitchcock v. Moore, 70 Mich., 112; Smith v. Potter, 27 Vt., 304; Brock v. Brock, 9 Atl. Rep., 486. The above list of cases is cited in Gant's case, supra."

It is contended by appellant in his bill of exceptions that State counsel's argument was harmful, prejudicial, inflammatory, and clearly inadmissible from any standpoint. We agree with his contention.

For the reasons indicated the motion for rehearing is granted, the affirmance set aside, and the judgment reversed and the cause remanded.

*Reversed and remanded.*

MORROW, JUDGE.—I concur.

PRENDERGAST, JUDGE.—I respectfully protest and dissent. The original opinion by the whole court at the time is unquestionably cor-

rect. The motion should be overruled and the judgment affirmed—it should not be reversed.